UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ANGELA HEYNE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:11-CV-305 JD |
| | ) | |
| NICK'S AMERICAN PANCAKE AND | ) | |
| CAFÉ, INC. and NICK KLADIS, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION and ORDER

On August 1, 2011, Plaintiffs Angela Heyne, Angela King, and Stacey DeVreese filed a

complaint [DE 1], thereafter amended on September 16, 2011 [DE 12] and December 7, 2011

[DE 27] to omit class action allegations and to dismiss Defendants Jim Kladis and Zoi Kladis

from the lawsuit. Plaintiffs alleged approximately twenty federal and state claims against their

former employer Defendant Nick Kladis, as the owner and operator of Defendant Nick's

American Pancake and Café, Inc. a/k/a American Pancake House involving discrimination,

harassment, and retaliation under 42 U.S.C. § 1981, 42 U.S.C. § 2000(e) and Indiana law, as well

as state law claims for assault, battery, negligent infliction of emotional distress, intentional

infliction of emotional distress, and violation of Indiana Food Safety Standards [DE 27][1].

Ultimately, only fourteen of those claims were presented to the jury [DE 108]. Specifically, each

plaintiff sought compensatory and punitive damages under Title VII for sexual harassment and

under state law for claims of assault, battery, and intentional infliction of emotional distress

(IIED). *Id.* In addition, Angela King claimed she was retaliated against in February 2010 when

---

[1] It is unclear exactly how many claims were initially asserted against defendants given the ambiguity of the allegations in the second amended complaint, however several claims were withdrawn prior to trial.

she was terminated for reporting sexual harassment and Stacey DeVreese claimed she was discriminated against in November 2010 when she was terminated because she was pregnant. *Id.* The case was transferred to the undersigned shortly before trial. At trial, the plaintiffs themselves asked the jury during direct examination to award them the amount they felt was appropriate given the evidence presented, but during closing arguments, plaintiffs' counsel specifically requested $675,000 in damages or $225,000 for each plaintiff (including punitive damages).

After the four day trial, the jury determined that Defendant Nick Kladis had both ownership and control over Defendant Nick's American Pancake and Café, Inc. at the times of the alleged offenses such that both defendants could be held liable [DE 108]. Relative to the plaintiffs' claims, the jury concluded that Stacey DeVreese failed to prove any of her claims. *Id.* Angela Heyne succeeded on all of her claims, but the jury awarded no damages whatsoever for her claims of assault and IIED, and gave her a punitive damages award of $10,000 for her Title VII sexual harassment claim and a punitive damages award of $2,000 for her battery claim. *Id.* The jury found Angela King failed to prove sexual harassment, assault, or IIED, but found that King successfully proved both her Title VII retaliation claim resulting in a $10,000 punitive damages award and her claim for battery resulting in a $2,000 punitive damages award. *Id.*

In sum, plaintiffs were successful on six of fourteen claims sent to the jury, representing an approximate success rate of 43%. Stacey DeVreese received nothing, while both Angela Heyne and Angela King each received $12,000 in punitive damages and zero compensatory damages. Ultimately, their total award of $24,000 equals only 3.5% of the total relief requested from the jury.

After the jury's verdict, the parties filed various briefs and motions in support of their positions relative to the award of attorneys' fees, costs, and other relief, and these submissions have all been considered by the Court [DE 116-125; DE 128-132; DE 134; DE 136-139].  In addition, the Court held an evidentiary hearing on damages [DE 133], during which counsel were given an opportunity to state their respective positions.  During that hearing, many agreements were reached relative to the proper calculation of damages, including back pay, and those agreements are incorporated herein.

I.      Punitive Damage Awards

No one contests the punitive damages awarded by the jury.  The jury awarded Heyne and King each $2,000 in punitive damages on their respective battery claim. *See e.g., Fall v. Indiana University Bd. of Trustees*  33 F.Supp.2d 729, 741-42 (N.D. Ind. 1998) (noting that under Indiana law, punitive damages for assault and battery must be supported by clear and convincing evidence, and the evidence must establish that the defendant acted with malice, fraud, gross negligence, or oppression which did not result from mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other human failing).  The parties have agreed that under state law the punitive damage awards are split as directed under Ind. Code 34-51-3-6.  That is, 25% goes to the successful plaintiff, while 75% goes to the victims compensation fund.  The Court previously advised the parties that it would reduce any punitive damages award after the verdict [DE 96], and therefore Angela Heyne and Angela King shall each receive $500 plus post judgment interest for their respective successful battery claim, while the remaining $1,500 plus post judgment interest on each claim shall be paid to the victims compensation fund.

Accordingly, Defendants Nick Kladis and Nick's American Pancake Café, Inc. are jointly and severally liable for the payment of $4,000 plus post judgment interest in punitive damages on the state law claims of battery to the clerk of the court, Ind. Code 34-51-3-6(b). The clerk of the court is DIRECTED to pay Angela Heyne and Angela King each 25% of their individual punitive damage award of $2,000 plus post judgment interest, and deposit the remaining 75% of each of the awards into the violent crime victims compensation fund established by Ind. Code 5-2-6.1-40, pursuant to Ind. Code 34-51-3-6(c).

Further, no one contests the individual awards of $10,000 for Heyne's verdict on her Title VII sexual harassment claim and King's verdict on her Title VII retaliation claim. *See* 42 U.S.C. § 1981a(b)(1) (indicating that a complaining party may recover punitive damages under this section if a party engaged in a discriminatory practice with malice or reckless indifference to the federally protected rights of an aggrieved individual). Accordingly, the Defendants Nick Kladis and Nick's American Pancake Café, Inc. are jointly and severally liable for the payment of $10,000 plus post judgment interest in punitive damages to each of the plaintiffs, Angela Heyne and Angela King, on their successful Title VII claims.

II.     Back Pay on Title VII claims

Angela Heyne and Angela King's success on their Title VII claims opens the door to the recovery of back pay, 42 U.S.C. § 2000e-5(g)(1), and the parties agreed prior to the jury trial in this case that the Court would determine the appropriate amount of back pay. The Seventh Circuit has stated that a "district court has broad equitable discretion to fashion back pay awards to make the Title VII victim whole [and that] [o]nce the district court [finds] unlawful discrimination in violation of Title VII, there [is] a strong presumption that [a plaintiff is]

entitled to a back pay award on the basis of what she would have earned absent the discrimination." *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1997) (citations omitted). The Seventh Circuit has also directed that "the plaintiff has the burden of proving the damages caused [to] her [and that such] damages are determined by 'measuring the difference between actual earnings for the period and those which she would have earned absent the discrimination by defendant.'" *Horn v. Duke Homes*, 755 F.2d 599, 606 (7th Cir. 1985) (quoting *Taylor v. Philips Indus., Inc.*, 593 F.2d 783, 786 (7th Cir. 1979)). Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. 42 U.S.C. § 2000e–5(g). In determining the proper award of back pay, a court must make sure that any award is not speculative and does not put the plaintiff in a better position than she was before her termination. *See Ilona*, 108 F.3d at 1580 (relying on *United States v. City of Chi.*, 853 F.2d 572, 575 (7th Cir. 1988) for the notion that "[t]he court must 'do its best to recreate the conditions and relationships that would have existed if the unlawful discrimination had not occurred'"). The defendant has the burden of demonstrating that a plaintiff who was unlawfully discharged did not make adequate efforts to mitigate her damages by securing other employment. *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994) (in order to establish the affirmative defense of a plaintiff's failure to mitigate damages, the defendants must show that: (1) the plaintiff failed to exercise reasonable diligence to mitigate her damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence).

Much of the submissions by plaintiffs' counsel relative to the appropriate amount of back pay to be awarded relied on the anticipated expert testimony of Kevin Scullion who relied on the

United States Bureau of Labor Statistics to determine the average wage of waitresses in the South Bend area during the relevant time. Plaintiffs' counsel initially claimed that Scullion's testimony was necessary because defendants failed to properly report Heyne and King's total compensation as reflected on their inaccurate W-2 forms. Plaintiffs' counsel represented that Scullion would provide testimony based on national statistics which would support Heyne's claim for back pay and interest in the amount of $31,038.30 (utilizing a damages period stretching from her initial termination until the present), and King's claim for back pay and interest in the amount of $36,793.62 (based on a damages period stretching from her initial termination until the present).

At the evidentiary hearing, however, both parties agreed that the calculations were not the best evidence and failed to calculate back pay using the correct time frames. In short, Scullion's "average wage" testimony based on national statistics and any related exhibits are irrelevant and unnecessary, given that both Heyne and King testified at trial, as supplemented at the hearing, about their average weekly earnings from waitressing at American Pancake House. In other words, there is no need to rely on less reliable averages and statistics, when the plaintiffs' own testimony provides direct evidence of their actual weekly wages and tips.[2] In addition, plaintiffs' counsel agreed that King's back pay is limited to the several week period between her retaliatory termination and her return to work. Other than raising the fact that plaintiffs' tips were not properly reported on their W-2's (which didn't reflect any tips at all), defendants do not contest the average number of hours worked by plaintiffs or their typical pay. However, defendants do argue that Heyne's back pay period should be shortened by her failure

---

[2]At the evidentiary hearing, plaintiffs' counsel conceded that in light of plaintiffs' own testimony concerning their hours worked and wages earned, the testimony from Scullion was not necessary. Plaintiffs' counsel also confirmed that they were not pursuing the theory that the plaintiffs worked fewer hours (than their average 30-35 hours per week) due to a hostile environment.

to mitigate damages given the availability of other waitressing jobs during the relevant time period.[3]

Angela Heyne's testimony from trial and the evidentiary hearing established that she earned $2.13 or $2.15 an hour and roughly $65 a week (which is indicative of her working about 30 hours per week). Heyne also consistently testified that she made approximately $500 in tips per week although her tax forms reveal that these tips were not reported. Despite her inaccurate W-2's, the Court will credit Heyne's testimony relative to the amount of tips she made, given that she appeared credible in commenting on the "amazing" tips she received, that her testimony was consistent with the testimony of other waitresses working for Kladis, that she admitted her W-2's did not properly reflect the tips she earned (an error she blamed Kladis for because he improperly recorded her tips) and that her testimony was uncontroverted. So even though Heyne's W-2's did not reflect her actual earnings, the Court finds it more likely than not that she earned approximately $500 in tips per week.

Relative to defense counsel's argument that Heyne failed to mitigate damages [DE 128], the trial did include testimony from a least one waitress, Nicole Holeman, who indicated waitressing jobs were readily available in the area during the time frame when Heyne was constructively terminated. Yet, even assuming such jobs were readily available, the defense has failed to provide sufficient evidence that she failed to exercise the necessary reasonable diligence to mitigate her damages. In fact, Heyne testified during the evidentiary hearing that after her last

---

[3]To the extent defense counsel argues that Heyne should not recover any back pay because the jury did not find that she was either actually or constructively discharged [DE 128], the argument is without merit. The jury was specifically instructed, in relevant part, that in order for Heyne to successfully prove her sexual harassment claim they must unanimously agree that she was subjected to unwelcomed sexual harassment that made her environment hostile or abusive, occurred because she was female, and caused her to quit because defendants' conduct made her working conditions so intolerable that a reasonable person in her position would have had to quit [DE 111 at 22]. The jury then found that Heyne had successfully proven her claim.

day of working for American Pancake House she placed her resume on various employment related websites, applied for various jobs (including waitressing jobs), and had a few interviews with local businesses. Heyne stated she never refused a job offer and was finally employed with Gurley Leep Nissan approximately seven months later making the same amount of money she was making at the American Pancake House. As such, the Court concludes that there is an insufficient basis upon which to conclude Heyne failed to mitigate her damages. Accordingly, Heyne's back pay award will be calculated by taking her average weekly wage ($564.00, including wages and tips) multiplied by 28 weeks (or 7 months from August 15, 2010 when she found comparable work). Heyne's total back pay award is $15,820.00, plus post judgment interest.

Angela King's testimony from trial established that she worked on average 30 hours or less per week and earned $2.13 an hour. She testified to making on average $200-400 in tips per week. King's testimony on direct and re-direct examination established that she returned to work only 2 weeks after being terminated in February 2010 for telling Kladis that sexual harassment was illegal. Accordingly, King's back pay award will be calculated by taking her average weekly wage ($364.00, including wages and average tips of $300[4]) multiplied by 2 weeks,[5] for a total back pay award of $728.00 plus post judgment interest.

---

[4]Angela King's testimony indicated that although she earned a maximum of $500 in tips per week, on average she earned between $200-400 in tips per week and she was making somewhere between $300-600 biweekly. Therefore, the Court believes the most reasonable estimate of her tips was $300 per week.

[5]Plaintiffs' counsel indicated it would rest on the evidence presented at trial relative to back pay, and the parties' agreed that King's back pay should be limited to the number of weeks between the time she quit and then returned to the American Pancake House. The Court also agrees that the trial evidence presents the most reliable evidence relative to back pay and therefore relies on King's testimony that she worked 30 hours per week and returned 2 weeks after being terminated (although there was some discussion during the evidentiary hearing that King may have worked as many as 35 hours a week and had returned to work 3-4 weeks after being terminated in February 2010).

To the extent defense counsel argues that any back pay awarded to Heyne and King should be reduced by their failure to quit sooner (Heyne) or by returning to work knowing the harassment/discrimination they would face (King)—the claim is simply meritless. The Seventh Circuit has flatly rejected such an assumed-risk affirmative defense approach relative to Title VII. *See Smith v. Sheahan,* 189 F.3d 529, 534-535 (7th Cir. 1999) ("Employers who tolerate workplaces marred by exclusionary practices and bigoted attitudes cannot use their discriminatory pasts to shield them from the present-day mandate of Title VII. There is no assumption-of-risk defense to charges of workplace discrimination. At the same time, we recognize that the culture of workplaces does differ from setting to setting. As the Supreme Court instructed in *Oncale* [*v. Sundowner Offshore Services, Inc.*, 118 S.Ct. 998, 1003 (1998)], juries-and judges-must bring their "common sense" and "an appropriate sensitivity to social context," *id.*, to bear when they make the threshold determination whether certain forms of behavior, in a given work setting, are discriminatory or not."). Here, the evidence revealed conduct that would be objectively and subjectively unacceptable to the average employee and there will be no reduction in the back pay awarded Angela Heyne for failing to quit before August 2010 or Angela King for returning to work shortly after her February 2010 termination.

Plaintiffs also request[6] prejudgment interest on their back pay awards, calculated pursuant to the average prime rate for the time period in question, or 3.25% [DE 118 at 4]. Other than generally objecting to an award of back pay, defendants do not contend that an award of

---

[6]In passing, plaintiffs' counsel alluded to the fact that the Court may also require defendants to pay plaintiffs the amount of money they received in unemployment benefits, realizing of course the plaintiffs would then have an obligation to return the money to the State of Indiana [DE 118 at 4]. However, plaintiffs' evidence on unemployment compensation [DE 121] only lists annual receipts and does not provide the detail necessary to make such an award relative to the limited time frames at issue.

prejudgment interest is inappropriate nor do defendants provide an alternate method for its calculation [DE 128].

There is no doubt that "Title VII authorizes prejudgment interest as part of the back pay remedy in suits against private employers." *U.S. E.E.O.C. v. Gurnee Inn Corp.*, 914 F.2d 815, 819-20 (7th Cir. 1990) (quoting *Loeffler v. Frank*, 486 U.S. 549, 557 (1988)). Indeed, the Supreme Court has said that it is a "normal incident" of relief in Title VII suits. *Id.* at 558; *see Donnelly v. Yellow Freight System, Inc.*, 874 F.2d 402 (1989) (holding that the failure to award prejudgment interest is an abuse of discretion); *see also U.S. E.E.O.C.*, 914 F.2d at 820 (concluding that where damage amounts were easily ascertainable the district court did not abuse its discretion in awarding compounded prejudgment interest). And even though the granting of prejudgment interest is left to the sound discretion of the district court, the Seventh Circuit's more recent decisions have somewhat limited the district court's discretion. *U.S. v. Board of Educ. of Consol. High School Dist. 230, Palos Hills, Ill.*, 983 F.2d 790, 799 (7th Cir. 1993) (internal citation omitted). For example, in *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989), the Seventh Circuit stated that "[t]he time has come . . . to generalize, and to announce a rule that prejudgment interest should be presumptively available to victims of federal law violations. Without it, compensation is incomplete and the defendant has an incentive to delay." *U.S. v. Board of Educ. of Consol. High School Dist. 230, Palos Hills, Ill.*, 983 F.2d at 799 (holding that the district court did not abuse its discretion in awarding prejudgment interest because the damages were reasonably ascertainable).

And while there are many circuit court cases holding that district courts have wide discretion on the issue of prejudgment interest, including what rate to use and how to calculate it,

there is a surprising lack of consensus on exactly what rate to use and exactly how to apply it. *Staples v. Parkview Hosp., Inc*., No. 1:07-CV-327, 2010 WL 780204, *11 (N.D. Ind. Mar. 3, 2010). However, the Seventh Circuit has indicated that courts should use the prime rate as the benchmark for prejudgment interest unless either there is a statutorily defined rate or the district court engages in "refined rate-setting" directed at determining a more accurate market rate for interest. *Cement Division, National Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998).

Here, the Court finds that in order to make the plaintiffs whole for their injuries suffered through defendants past intentional discrimination, the Court will award prejudgment interest on their readily determined back pay awards at the average prime rate of 3.25%. *See David v. Caterpillar, Inc*., 324 F.3d 851, 865- 66 (7th Cir. 2003) ("The district court has broad equitable discretion to fashion back pay awards to make the Title VII victim whole."); *Fine v. Ryan Intern. Airlines,* 305 F.3d 746, 757 (7th Cir. 2002) (determining that even though the majority of plaintiffs award consisted of punitive damages, plaintiff only sought interest on the back pay award which was proper). The Court would note that the prime rate is no different whether looking at the dates at issue (February through August 2010), or utilizing today's prime rate. Therefore, the Court grants plaintiffs' request for prejudgment interest on their back pay awards at the rate of 3.25 %, compounded annually since February 2010.

It should also be noted that from the date of this order, post-judgment interest at a rate of 0.11% shall accrue on the award of punitive damages and back pay under 28 U.S.C. § 1961.

III.    <u>Attorneys' Fees</u>

Pursuant to 42 U.S.C. § 2000e-5(k) of Title VII, "In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs[.]" *Cf. Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 417 (1978) ("[A] prevailing [Title VII] plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances.").

Angela Heyne won a liability verdict with respect to her hostile work environment/sexual harassment claim, and is therefore a prevailing party. Angela King was successful with respect to her retaliation claim, and is also a prevailing party. In fact, neither party disputes that Heyne and King are considered prevailing parties, but defense counsel argues that no attorneys' fees ought to be awarded because plaintiffs only achieved nominal success at trial [DE 125]. However, defense counsel does agree with plaintiffs' counsel that the initial fee award should be assessed by calculating the "lodestar" of a reasonable fee times reasonable hours, the methodology from *Hensley v. Eckerhart*, 461 U.S. 424 (1983) for conventional prevailing parties [DE 125 at 3], and then reduced for factors not already considered in the lodestar.

The Court agrees with the parties that the correct method to use for the calculation of fees is the lodestar method, rather than the method employed in *Farrar v. Hobby*, 506 U.S. 103 (1992) which is used when a plaintiff's recovery is merely minimal, technical, or de minimis. *See Aponte v. Chicago*, 728 F.3d 724, 726-728 (7th Cir. 2013). While it is true that plaintiffs did not recover the amount they set out to receive, plaintiffs received a total award of $24,000 in punitive damages (approximately 3.5% of the total relief requested of the jury at trial)—and, this is no "trifling victor[y]." *Id*. at 727 (citations omitted). The award of $10,000 in punitive

damages to two of the three plaintiffs on their respective Title VII claims is not a nominal award, rather it is indicative of the jury's finding defendant's conduct sufficiently reprehensible to award punitive damages so as to punish the defendant and to serve as an example or warning to the defendant and others not to engage in similar conduct in the future [DE 111 at 30]. *See e.g., Classic Cheesecake Co., Inc. v. JPMorgan Chase Bank,* No. 1:05-cv-0236-WTL-JDT, 2007 WL 3285806, *3 (S.D. Ind. Nov. 5, 2007) ("An award of $10,000 in punitive damages is not 'nominal.' However, it is completely unreasonable to assert that the Plaintiffs achieved 'complete success' in this case. Classic Cheesecake argued during its closing argument that it was entitled to more than $4.4 million in compensatory damages plus punitive damages, and the jury awarded it zero in compensatory damages and $42,000 (now reduced to $10,000) in punitive damages. There is no escaping the fact that Classic Cheesecake was awarded a tiny fraction of the damages it sought."). Moreover, *Farrar* does not apply because in looking at the litigation history, it does not appear that plaintiffs inflicted unnecessary heavy costs on defendants as little discovery was conducted or wastefully expended judicial resources to litigate their claims since six of the fourteen claims that proceeded to trial were successful. *See Aponte*, 728 F.3d at 728-29 (regarding an attorneys' fee award under § 1988, the court held that in determining whether an award should be analyzed under *Farrar*, district courts should look at the entire litigation history, including the number of victorious versus unsuccessful claims, the amount of damages sought versus recovered, time expended by the parties, and judicial resources). And, after the Court denied defendants' motion for judgment on the pleadings [DE 45], no further dispositive motions were filed by the parties, the plaintiffs voluntarily narrowed

the focus of their claims during the final pretrial conference [DE 90; DE 96], and the case proceeded to trial.

Accordingly, the Court now turns to the calculation of the lodestar by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. *See Hensley*, 461 U.S. at 433-37; *see also Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 551 (2010) (criticizing the approach taken by *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714, 717-19 (5th Cir. 1974) which had provided twelve largely subjective factors to consider when determining a reasonable fee). There is a strong presumption that the lodestar calculation yields a reasonable attorneys' fee award. *Pickett v. Sheridan Health Care Center,* 664 F.3d 632, 639 (7th Cir. 2011) (citations omitted).

The Seventh Circuit has defined a reasonable hourly rate as one that is "derived from the market rate for the services rendered." *Pickett,* 664 F.3d at 640 (quoting *Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003)). The Court presumes that an attorney's actual billing rate for similar litigation is appropriate to use as the market rate. *Id.* Having recognized the difficulty of determining the hourly rate of an attorney who uses contingent fee agreements, the Seventh Circuit has advised district courts to rely on the "next best evidence" of an attorney's market rate, namely "evidence of rates similarly experienced attorneys in the community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases." *Pickett,* 664 F.3d at 640 (quoting *Spegon v. Catholic Bishop of Chi*., 175 F.3d 544, 555 (7th Cir. 1999)). Of these two alternatives, the Seventh Circuit has indicated a preference for third party affidavits that attest to the billing rates of comparable attorneys. *Id.* (citing *Spegon*, 175 F.3d at 556).

The fee applicant bears the burden of "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community." *Pickett*, 664 F.3d 632 at 640 (citing *Blum v. Stenson*, 465 U.S. 886, 895 n. 11 (1984)). If the fee applicant satisfies this burden, the burden shifts to the other party to offer evidence that sets forth "a good reason why a lower rate is essential." *Id*. (citations omitted). However, if the fee applicant does not satisfy its burden, the district court has the authority to make its own determination of a reasonable rate. *Id*. (citing *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 409 (7th Cir. 1999)).

The party seeking an award of attorneys' fees not only bears the burden of proving the hourly rates claimed, but must also prove the reasonableness of the hours worked. *Spegon*, 175 F.3d at 550 (citing *Hensley*, 461 U.S. at 433). Furthermore, the district court has an obligation to "exclude from this initial fee calculation hours that were not 'reasonably expended'" on the litigation. *Id*. (citing *Hensley*, 461 U.S. at 434). "Billing judgment consists of winnowing the hours actually expended down to the hours reasonably expended." *Id*. at 552 (quoting *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1250 (10th Cir. 1998)). In exercising "billing judgment," the Supreme Court emphasized that counsel for the prevailing plaintiff should "exclude from a fee request hours that are excessive, redundant, or *otherwise unnecessary*, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Id*. (quoting *Hensley*, 461 U.S. at 434). Put another way, hours that an attorney would not properly bill to his or her client in the private sector cannot properly be billed to the adverse party under a fee-shifting statute. *Id*. The court should disallow not only hours spent on

tasks that would normally not be billed to a paying client, but also those hours expended by counsel "on tasks that are easily delegable to non-professional assistance." *Id*. (citation omitted).

Once the district court has established the lodestar, the court may adjust it to account for factors not subsumed by the lodestar calculation. *See Johnson v. GDF, Inc.,* 668 F.3d 927, 929 (7th Cir. 2012) (stating that when a party is entitled to attorneys' fees, the court begins by calculating the Plaintiff's lodestar rate—the hours reasonably expended times the reasonable hourly rate and then in some circumstances, adjusts the lodestar rate); *Pickett*, 664 F.3d at 640 (citing *Perdue*, 559 U.S. at 553); *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010) (noting the court may exercise its discretion to "adjust [the lodestar] figure to reflect various factors including the complexity of the legal issues involved, the degree of success obtained, and the public interest advanced by the litigation. The standard is whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case.") (citation and internal citation omitted). The Seventh Circuit has considered on a number of occasions the problem presented by partially prevailing plaintiffs, and has set forth helpful language in *Bryant v. City of Chicago*, 200 F.3d 1092 (7th Cir. 2000) (quoting *Spanish Action Comm. v. City of Chi.*, 811 F.2d 1129 (7th Cir. 1987)):

> In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct.1933, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court set out guidelines for calculating the proper amount of an attorney's fee award in cases where the plaintiff only partially prevails on his claims. The Court divided these partial recovery cases into two categories. The first category involves cases where the plaintiff presents distinctly different claims for relief that are based on different facts and legal theories. A plaintiff may not recover attorney's fees for time expended on an unsuccessful claim if that claim is "distinct in all respects from his successful claims." *Id*. at 440, 103 S.Ct. at 1943. Untreated claims must be treated "as if they had been raised in separate lawsuits." *Id*. at 435, 103 S.Ct. at 1940.
>
> . . . . .

The second category of partial recovery cases, into which this action does fall, includes those cases in which the plaintiff's claims for relief involve a common core of facts or are based on related legal theories. Because the majority of counsel's time will be devoted to the litigation as a whole, as opposed to any one specific claim, this type of lawsuit cannot be viewed as a series of discrete claims. As a result, time spent on related claims that ultimately prove unsuccessful should not be automatically excluded from the attorney's fee calculation. Instead, the focus in arriving at the appropriate fee award should be on "the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940.

. . . . .

Where the plaintiff fails to obtain all that he reasonably could have asked for and achieves only partial or limited success, the lodestar amount-the product of the number of attorney's hours reasonably expended on the litigation as a whole times a reasonable hourly rate-is likely to be excessive. The Supreme Court therefore provided: "A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Hensley*, 461 U.S. at 440, 103 S.Ct. at 1943. The Court, however, articulated no precise rule or formula to be followed in making such a reduction, instead choosing to leave this determination to the discretion of the district court in view of its greater familiarity with the litigation. *Id.* at 436-37, 103 S.Ct. at 1941. The Court did indicate that in reducing a fee award to reflect the plaintiff's limited success, a district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award across the board to account for the limited success. *Id.*

*Bryant*, 200 F.3d at 1101 (quoting *Spanish Action Comm. v. City of Chi.*, 811 F.2d 1129, 1133 (7th Cir. 1987)).

Plaintiffs' counsel wants to obtain full compensation for every hour each lawyer and the firm's staff worked on the case, including time spent on DeVreese's unsuccessful claims (for sexual harassment, pregnancy discrimination, IIED, assault, and battery) and King's three unsuccessful claims (for sexual harassment, IIED, and assault) [DE 120; DE 132]. Plaintiffs' counsel suggests that normally an upward adjustment for taking the case on a contingency basis might be appropriate, but acknowledges the Court might reduce the award to account for

unsuccessful claims.  Plaintiffs' counsel also argues they have obtained "excellent results" and believes they are entitled to full compensation based on the factors listed in *Waters v. Wisconsin Steel Works of Intern. Harvester Co.,* 502 F.2d 1309 (7th Cir. 1974) (in awarding attorney's fees in an employment discrimination case, hours spent by the attorney and the billing rate were factors to be considered, but other factors included novelty and difficulty of the questions, skill required, likelihood of exclusion of other employment by the attorney if such likelihood was apparent to the client, fee customarily charged in the locality for similar services, amount involved and results obtained, time limitation imposed by the client or circumstances, the nature and length of the professional relationship with the client, experience, reputation and ability of the lawyer or lawyers performing the services, and whether the fee was fixed or contingent).

In support of their claim for fees, plaintiffs' counsel (who are from Indianapolis) submitted three separate billing sheets [DE 120-2; DE 120-3; and DE 134-1] seeking a total recovery of $218,118.65 in attorneys' fees.[7]  According to the invoices, Partner Kenneth Roberts bills $385.00 an hour, but $525.00 an hour for trial, Managing Partner Tasha Roberts bills $250.00 an hour, but $300.00 an hour for trial, Senior Associate Adam Lenkowski bills $200.00 an hour, but $250.00 an hour for trial, Associate Attorney Rudy Coram bills $150.00 an hour, while office assistants Dawn Ramsey and Kenneth Roberts, Jr. bill $75.00 an hour.  Plaintiffs have also provided four affidavits in support of their request for fees:  the affidavit of Kenneth Roberts [DE 120-1], the affidavit of Yvone Ferguson Watkins [DE 120-4], the supplemental affidavit of Kenneth Roberts [DE 134], and the affidavit of Richard Hailey [DE 138-1].

---

[7]DE 120-2 charges $149,543.90 in attorneys' fees, DE 120-3 charges $57,227.50 in attorneys' fees, and DE 134-1 charges $11,347.25 in attorneys' fees.

It is the defense's position that plaintiffs' fees should be lowered to represent hourly rates charged by attorneys in St. Joseph County because other competent lawyers in the area could have handled the plaintiffs' claims [DE 125]. Defense counsel also argues that once the lodestar is calculated, it should then be adjusted downward to an award of no fees in light of the minimal results obtained. Finally, defense counsel seeks to strike the affidavits of Mr. Roberts and Ms. Watkins arguing that they are hearsay, irrelevant, and immaterial [DE 123] and the affidavit of Mr. Hailey because it is hearsay and was filed after the submissions relating to damages were closed [DE 139].

To start, the Court denies defense counsel's request to strike the plaintiffs' affidavits namely because these types of affidavits are not only anticipated for purposes of supporting fee requests, but they are required. Rather than exclude the contents of the affidavits, the Court will detail their contents and determine the probative value of each evidentiary submission. *Pickett v. Sheridan Health Care Ctr.,* 664 F.3d 632, 646 (7th Cir. 2011) (citation omitted) (noting that a district court "is entitled to determine the probative value of each [evidentiary] submission."). Moreover, to the extent plaintiffs' filings were submitted belatedly, the Court declines to strike them because they were submitted prior to the Court's ruling on fees and defense counsel has had adequate opportunity to respond substantively to said submissions.[8]

Turning to the contents of the plaintiffs' affidavits, Mr. Roberts' experience is extensive and uncontroverted [DE 120-1]—he represents that he has practiced law since 1973, is admitted to practice in various jurisdictions, is the founding partner of his Indianapolis law firm, has successfully represented major corporations and been involved in high stakes cases, is involved

---

[8]Even if the Court struck the affidavit of Mr. Hailey for being filed too late, the outcome of this order would not change given that Ms. Watkins' timely affidavit offers similar testimony.

in the legal community, and he took the instant case on a contingent basis risking any right to recovery since plaintiffs were without any money to retain counsel.  Mr. Roberts affirms that when he bills on an hourly basis for litigation matters comparable to this civil rights case, he charges a minimum rate of $385 to $425 an hour.  In fact, Mr. Roberts was recently awarded an hourly rate of $525 in March of this year by a district judge in the Indianapolis Division wherein Mr. Roberts received a default judgment in favor of a plaintiff for a Title VII discrimination claim, and where the state claim for IIED was dismissed. *See Kia Tonge v. The Arantee Group, LLC and Ravi Chopra*, case no. 1:12-cv-570-JMS-MJD [DE 28].  In addition, Mr. Roberts contends that plaintiffs were unable to find counsel locally who would take the case on a contingent basis [DE 120-1 at 2]—a contention the defense disputes.  In litigating this case through trial, Mr. Roberts was primarily assisted by Ms. Tasha Roberts and Mr. Adam Lenkowsky, experienced litigators of no less than ten years.

Plaintiffs also provided the affidavit of Ms. Ferguson and Mr. Hailey which establish that they too are experienced litigators who have practiced with their own firms in Indianapolis for decades [DE 120-4; DE 138-1].  Given their own litigation experience in Indianapolis and knowledge of Mr. Roberts' background, they believe that Mr. Roberts' hourly billing rates are reasonable.  While the Court credits the affiants' testimony in this respect, it gives no weight to their unsupported speculation that such a rate is reasonable "no mater which jurisdiction" the case is pending.  Their affidavits simply lack a foundation for such a broad assertion.  Further, the law does not support their contentions that all of Mr. Roberts' billed hours are reasonable,[9] nor that Mr. Roberts is entitled to a multiplier simply because he took the case on a contingent

_____

[9]Rather, some of the hours are deemed by the Court as unnecessary, duplicative, or administrative. *See infra.*

basis. *See Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 645 (7th Cir. 2011) (the Supreme Court held in *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) that courts cannot enhance the lodestar to account for the risk of nonpayment incurred by attorneys who take cases pursuant to contingent fee agreements).

Defense counsel, Mr. Vincent Campiti, filed his own affidavit [DE 125-1] indicating that he has practiced law since 1997 in the areas of civil rights litigation, personal injury law, family/business law, and general defense work. Mr. Campiti charges $275.00 an hour, even for plaintiff's work under Title VII. And based on Mr. Campiti's experience with numerous plaintiffs' attorneys in St. Joseph County, he attests that the going rate is between $210 and $295 an hour. The Court credits Mr. Campiti's affidavit and has no reason to question the veracity of these statements.

In determining a reasonable hourly rate the parties would have the Court focus in part on the fact that plaintiffs' counsel entered into a contingent fee agreement with their clients indicating that plaintiffs' firm would be entitled to 50% of any award, which would be deducted from any court award for attorneys fees, and that the clients would pay the firm's usual hourly rate of $225.00 per hour for any non-monetary remedies awarded by the court [Def.'s Exb. B, Damages Hearing]. Given the contingency agreement, Mr. Roberts' claims that the Court should enhance his fee award based on the risk he incurred in representing plaintiffs on a contingent basis, while Mr. Campiti argues that plaintiffs' counsel should be bound to their stated hourly rate of $225.00. The Court rejects these arguments. First, the hourly rate of $225 is only applicable to non-monetary awards and is not indicative of a standard hourly rate necessarily charged by the firm. Second, and more importantly, the district court lacks authority to adjust

the hourly rate due to the existence of a contingent fee agreement and this includes not having the authority to enhance the lodestar to account for the risk of nonpayment. *Pickett*, 664 F.3d at 642-45 ("The Supreme Court has recognized that private fee arrangements and statutory fee awards can coexist . . .The Court has repeatedly distinguished between the statutory fee award, which compels the losing party to compensate the prevailing party for the attorney's services, and the contingent fee, which the plaintiff may contract to pay her attorney . . . This perspective conveys to district courts that they should view these fees as distinct and not allow a contingent fee to influence the determination of the reasonableness of an hourly rate") (citing *Venegas v. Mitchell*, 495 U.S. 82, 88, 90 (1990)).

In any event, the Court finds plaintiffs have met their burden in proving that their rates are reasonable market rates for the services rendered. First, Mr. Roberts has attested to the fact that his actual billing rate is as much as $425 an hour for out of court time and $525 an hour for trial time when he has taken similar cases on a non-contingent basis. Further, Mr. Roberts was recently awarded $525 an hour in another Title VII action in Indianapolis, *Kia Tonge v. The Arantee Group, LLC and Ravi Chopra*, a case which resulted in a favorable default judgment and did not go to trial or require the time and effort the instant case required. And the fee that was awarded in counsel's previous litigation need not be disputed in order to be relied on by this Court for purposes of determining a reasonable market rate. *See Jeffboat, LLC v. Director, Office of Workers' Compensation Programs,* 553 F.3d 487, 491 (7th Cir. 2009) ("Nothing in the case law requires that a party show that the hourly rate they have requested has previously been disputed and upheld, however. Indeed, a previous attorneys' fee award is useful for establishing a reasonable market rate for similar work whether it is disputed or not."). Lastly, while Mr.

Roberts has not produced evidence of what other local attorneys have actually been paid for similar work, he has provided the affidavits of two experienced Indianapolis counsel indicating they find his rates reasonable for the area.

While Mr. Campiti has attempted to refute this evidence and show a good reason why plaintiffs' rates should be lowered, he has failed to do so. First, the Court rejects Mr. Campiti's argument that plaintiffs' counsel should only be paid similar rates charged by attorneys in St. Joseph County, consistent with his own affidavit. The Seventh Circuit has determined that if an out-of-town attorney has a higher hourly rate than local practitioners, district courts should defer to the out-of-town attorney's rate when calculating the lodestar amount, though if "local attorneys could do as well, and there is no other reason to have them performed by the former, then the judge, in his discretion, might allow only an hourly rate which local attorneys would have charged for the same service." *Mathur v. Bd. of Trustees of Southern Illinois Univ.,* 317 F.3d 738, 744 (7th Cir. 2003) (citation omitted). Thus, while this court has the discretion to modify Mr. Roberts' rates if there is reason to believe that services of equal quality were readily available at a lower charge or rate in the area where the services were rendered, the only evidence before the Court demonstrates that plaintiffs were unable to find anyone in South Bend who could provide these services. In fact, Angela Heyne testified at trial that she searched for and contacted civil rights attorneys in South Bend and was unable to find anyone to take this type of case. While the Court is personally aware that there are local attorneys who litigate civil rights cases on behalf of plaintiffs and who could have competently handled this type of case, the Court has no reason to discredit Heyne's testimony that she was unable to find anyone locally

who would take this case on a contingent basis.[10]  The case was not necessarily a strong one either, as reflected by the evidence presented and the result, thereby making the case even less attractive.  Therefore, it was reasonable for Heyne to search for an attorney in Indianapolis after exhausting her options in South Bend.  Second, since Heyne found Mr. Roberts' firm after being unable to secure a local attorney (with King joining the lawsuit later), the Court may make the fee allowance on the basis of the chosen attorney's out of market billing rates.  Mr. Campiti presents no evidence to contradict the reasonableness of the Indianapolis rates found in plaintiffs' invoices.  Because it has not been shown that the rates customarily charged in Indianapolis for truly similar services requires any adjustment, the Court finds that the rates proposed by plaintiffs' counsel are reasonable.  The Court would finally note that the hourly fees charged by the other attorneys in Mr. Roberts' firm have rates which are consistent with Mr. Campiti's attestation that the going rate for similar work in St. Joseph County is between $210 and $295 an hour.

### Reasonable Number of Hours Worked

Having determined the reasonable rates, the Court must now determine whether the hours billed are reasonable.  *See Trustees of Chicago Plastering Inst. Pension Trust v. Cork Plastering Co.,* 570 F.3d 890, 904-05 (7th Cir. 2009) (citation omitted) ("A district court necessarily must assess the reasonableness of any fees and costs requested.").  The reasonableness of the time expended by an attorney on behalf of a client depends not only on the total number of hours involved but also on the particular tasks to which the attorney devoted his or her time. *Id.* at 905

---

[10]The Court found her testimony in this regard credible and was uncontroverted.  The Court would note that in concluding plaintiffs were unable to find local counsel, the Court does not rely on Mr. Roberts' limited search for Title VII litigators in the South Bend area, which was conducted after the verdict simply in an attempt to establish local hourly rates for similar cases.

(other citations omitted).  It is not at all unusual for a court to determine that some aspects of an attorney's work were not fruitful, were unnecessary, or merited less time than the attorney devoted to them, and to deny compensation for those portions of the attorney's work. *Id.*  Again, the party seeking an award of attorneys' must prove the reasonableness of the hours worked. *Spegon*, 175 F.3d at 550 (citing *Hensley*, 461 U.S. at 433).

Having thoroughly reviewed plaintiffs' three separate billing sheets [DE 120-2; DE 120-3; and DE 134-1], the Court has determined that a number of individual entries must be reduced or omitted altogether.  While the Court's deductions are detailed in the chart below, the primary basis for the deductions are noted as follows: (1) the billing party billed more than once for what appeared to be the same work ("double billing"); (2) the hours billed were deemed "unnecessary" to the litigation (for instance, the record for the instant litigation did not indicate that the filing of a lis pendens against defendants' property was part of the instant case, nor were any experts, including CPA's, necessary to calculate damages given plaintiffs' own trial testimony provided a sufficient basis upon which to calculate damages); and (3) an attorney unnecessarily billed for performing "administrative" work, *see Spegon,* 175 F.3d at 553 (noting that the court should disallow hours expended by counsel on tasks that are easily delegable to non-professional assistance, such as updating the case list, calendaring, organizing file folders, and copying documents).

**ATTORNEYS' FEES CALCULATION**

| Timekeeper | Date Billed | Time Billed | Time Struck | Reason |
| --- | --- | --- | --- | --- |
| **TIME SHEET DE 120-2:** | | | | |
| **Adam Lenkowsky** | | | | |
| | 08/28/11 | 3.60 | 2.00 | Unnecess./Excessive |
| | 10/27/11 | 0.40 | 0.40 | Double Bill w/ KTR |

|            |                   |      |      |                   |
|------------|-------------------|------|------|-------------------|
|            | 10/28/11          | 2.50 | 2.00 | Unnecessary/Admin. |
|            | 11/14/11          | 1.00 | 0.80 | Administrative    |
|            | 01/12/12          | 0.20 | 0.20 | Administrative    |
|            | 01/18/12          | 0.10 | 0.10 | Administrative    |
|            | 01/20/12          | 0.10 | 0.10 | Administrative    |
|            | 03/08/12          | 0.30 | 0.30 | Administrative    |
|            | 03/12/12          | 0.25 | 0.25 | Administrative    |
|            | 06/07/12          | 0.20 | 0.20 | Administrative    |
|            | 08/22/12-09/24/12 | 0.90 | 0.90 | Unnecessary/Admin. |
|            | 01/15/13          | 0.10 | 0.10 | Unnecessary/Admin. |
|            | 04/24/13-04/25/13 | 4.00 | 2.50 | Triple Billing    |

Total Hours Struck for AL:                                        *9.85 hours struck*

Total Due for AL:         92.90-9.85 = 83.05 hours x $200.00/hr =       **$ 16,610.00**

**Dawn Ramsey**

|            |                   |      |      |                   |
|------------|-------------------|------|------|-------------------|
|            | 08/22/12-09/24/12 | 0.80 | 0.30 | Unnecessary/Admin. |

Total Hours Struck for DR:                            *0.30 hours struck*

Total Due for DR:         69.13-0.30= 68.83 hours x $75.00/hr =       **$ 5,162.25**

**Kenneth Roberts**

|            |          |      |      |             |
|------------|----------|------|------|-------------|
|            | 11/04/11 | 0.50 | 0.50 | Unnecessary |
|            | 04/10/13 | 3.00 | 3.00 | Unnecessary |
|            | 05/11/13 | 0.60 | 0.60 | Unnecessary |
|            | 05/12/13 | 0.25 | 0.25 | Unnecessary |
|            | 05/14/13 | 0.70 | 0.70 | Unnecessary |
|            | 05/14/13 | 0.30 | 0.30 | Unnecessary |
|            | 05/15/13 | 0.30 | 0.30 | Unnecessary |
|            | 05/20/13 | 0.20 | 0.20 | Unnecessary |

Total Hours Struck for KTR:                           *5.85 hours struck*

Total Due for KTR:        283.04-5.85= 277.19 hours x $385.00/hr =     **$ 106,718.15**

**Kenneth Roberts, Jr.**

|            |          |      |      |                |
|------------|----------|------|------|----------------|
|            | 04/28/13 | 0.30 | 0.30 | Double Billing |

Total Hours Struck for KTRJR:                      *0.30 hours struck*

Total Due for KTRJR:       41.25-0.30= 40.95 hours x $75.00/hr =       **$ 3,071.25**

**Rudy Coram**
Total Hours Struck for RC:    none
Total Due for RC:    24.35 hours x $150.00/hr =    $   3,652.50

**Tasha Roberts**

| Date | Hours | Struck | Reason |
|---|---|---|---|
| 04/21/13 | .25 | .25 | Administrative |
| 04/30/13 | 1.00 | 1.00 | Double Billing |
| 04/30/13 | 0.50 | 0.50 | Double Billing |
| 05/12/13 | 0.25 | 0.25 | Unnecessary |
| 05/13/13 | 0.25 | 0.25 | Unnecessary/Admin. |
| 05/14/13 | 0.25 | 0.25 | Unnecessary |
| 05/14/13 | 0.75 | 0.75 | Unnecessary |
| 05/15/13 | 1.00 | 1.00 | Unnecessary |
| 05/16/13 | 0.10 | 0.10 | Unnecessary |
| 05/23/13 | 0.15 | 0.15 | Unnecessary/Admin. |

Total Hours Struck for TR:    *4.50 hours struck*

Total Due for TR:    40.25-4.50= 35.75 hours x $250.00/hr =    $   8,937.50

## TOTAL ATTORNEYS' FEES DUE FOR TIME SHEET DE 120-2:
**Adam Lenkowsky**    $  16,610.00
**Dawn Ramsey**    $   5,162.25
**Kenneth Roberts**    $ 106,718.15
**Kenneth Roberts, Jr.**    $   3,071.25
**Rudy Coram**    $   3,652.50
**Tasha Roberts**    $   8,937.50
    **$ 144,151.65**


## TIME SHEET DE 120-3:
**Adam Lenkowsky**
Total Hours Struck for AL:    none
Total Due for AL:    45.10 hours x $250.00/hr =    $ 11,275.00


**Kenneth Roberts**

| Date | Hours | Struck | Reason |
|---|---|---|---|
| 05/10/13 | 26.20[11] | 10.20 | Unnecessary/Excess. |

Total Hours Struck for KTR:    *10.2 hours struck*
Total Due for KTR:    68.70-10.20= 58.50 hours x $525.00/hr =    $ 30,712.50

---

[11]The fact that Mr. Roberts billed more than 24 hours in a single day calls into question the accuracy of counsel's billing and does not inspire confidence in the billing employed here.

**Tasha Roberts**
Total Hours Struck for TR:    none
Total Due for TR:    32.95 hours x $300.00/hr =    $  9,885.00

**TOTAL ATTORNEYS' FEES DUE FOR TIME SHEET DE 120-3:**
**Adam Lenkowsky**    $ 11,275.00
**Kenneth Roberts**    $ 30,712.50
**Tasha Roberts**    $  9,885.00
**$ 51,872.50**

**TIME SHEET DE 134-1:**
**Adam Lenkowsky**
06/11/13    0.80    <u>0.80</u>    Unnecessary/Admin.
Total Hours Struck for AL:    *0.80 hours struck*

Total Due for AL:    7.10-0.80=6.30 hours x $200.00/hr =    $  1,260.00

**Dawn Ramsey**
Total Hours Struck for DR:    none
Total Due for DR:    1.65 hours x $75.00/hr =    $    123.75

**Kenneth Roberts**
Total Hours Struck for KTR: none
Total Due for KTR:    24.10 hours x $385.00/hr =    $  9,278.50

**Tasha Roberts**
Total Hours Struck for TR:    none
Total Due for TR:    2.10 hours x $250.00/hr =    $    525.00

**TOTAL ATTORNEYS' FEES DUE FOR TIME SHEET DE 134-1:**
**Adam Lenkowsky**    $ 1,260.00
**Dawn Ramsey**    $    123.75
**Kenneth Roberts**    $ 9,278.50
**Tasha Roberts**    $    525.00
**$11,187.25**

**GRAND TOTAL ATTORNEYS' FEES DUE FOR ALL TIME SHEETS:**
**TOTAL ATTORNEYS' FEES DUE FOR TIME SHEET DE 120-2:**    $144,151.65
**TOTAL ATTORNEYS' FEES DUE FOR TIME SHEET DE 120-3:**    $ 51,872.50
**TOTAL ATTORNEYS' FEES DUE FOR TIME SHEET DE 134-1:**    $ 11,187.25
***$207,211.40***

Accordingly, the requested amount of attorneys' fees, reduced by the line items charted above, equals a legal fee award of **$207,211.40**.

### *Lodestar and its reduction*

Having derived the lodestar, the court may adjust it to account for factors not already considered in the lodestar calculation. *Pickett*, 664 F.3d at 640 (citing *Perdue*, 559 U.S. at 553). Here, the Court finds various reasons that require a reduction in the total fee award, including time spent on unsuccessful claims, the non-complex straight forward nature of the case, the fact that multiple attorneys working on the case resulted in duplicative hours and cumulative excessive billing, as well as lack of proportionality between the damages received and the attorneys' fees sought and the minimal public interest advanced given the circumstances of this particular case. *See e.g., Gastineau*, 592 F.3d at 748 (lodestar figure may be reduced to include the complexity of the legal issues, the degree of success obtained, and the public interest advanced by the litigation); *Schlacher v. Law Offices of Phillip J. Rotche & Associates, P.C.*, 574 F.3d 852, 857 (7th Cir. 2009) (fee reduced because the collaboration among the attorneys had inevitably led to duplicative work and excessive billing and after considering the proportionality between the damages and attorneys' fees).

In the present case, there is no doubt that the relief obtained was very limited in relationship to the total relief sought. Although plaintiffs were awarded punitive damages and received an award of back pay, the plaintiffs were successful on less than 50% of their claims and received far less than the $675,000 in damages requested by plaintiffs' counsel. As *Hensley* points out, in such cases, a reduced fee amount is appropriate. In reducing the award, the Court is unable to specify the precise billing entries or number of hours that should be eliminated for

litigating DeVreese and King's unsuccessful claims, since the action involved a common core of facts and was based on related legal theories among the plaintiffs. *See e.g., Bryant*, 200 F.3d at 1101 (citing *Spanish Action Comm.*, 811 F.2d at 1133). And therefore the Court focuses on the significance of the overall relief. *Id*. While it is true that plaintiffs' limited success was more than a nominal victory, the Court cannot agree with Mr. Roberts that the plaintiffs obtained anything close to a 'complete success.' Rather, plaintiffs received only a fraction of their requested damages, no compensatory damages were awarded, and one plaintiff walked away completely empty handed. Further necessitating a reduction in the fee, yet complicating the determination of an appropriate reduction, is the fact that this was a relatively uncomplicated case—no depositions were taken or experts called for trial, rather the trial evidence consisted simply of eye witness testimony and a "he-said-she-said battle". And yet, a total of four attorneys collaborated on the case and their work unnecessarily resulted in overlapping billing (even on mostly lost claims). The Court believes that the case was not so complicated as to require multiple counsel. Thus, the Court will reduce the fee award across the board by 50% to account for the fact that less than 50% of the claims presented to the jury were successful[12] despite having several attorneys performing overlapping work on a straight forward case.

Additionally, the Court believes the 50% reduction is sufficient to further account for the lack of proportionality between the damages received and the attorneys' fees sought, and to account for the minimal public interest involved here. Certainly there is a strong interest in eliminating the use of discrimination and/or presence of sexual harassment in the work force, but the employer here was not a public entity or large corporation, rather it was a small local

---

[12]Again, if the Court were to consider all of the claims initially pled by plaintiffs but not submitted to the jury, then their rate of success was even lower.

restaurant and the lawsuit vindicated the rights of only two individual plaintiffs. And as explained below, plaintiffs also did not succeed in showing that injunctive relief was appropriate here. Given the circumstances a 50% reduction seems most reasonable and will result in an attorneys' fee award that is still a little more than four times the total punitive damages recovered, but only about 2.5 times more than the total punitive damages and back pay awarded.

The total reduction of 50% will result in a total attorneys' fee award of $103,605.70 (or $207,211.40 - 103,605.70), which the Court deems reasonable in light of all of the relevant factors for this particular case.

IV.    Costs

Federal Rule of Civil Procedure 54(d) gives courts the discretion to award costs to prevailing parties. That Rule provides in relevant part: "Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). The United States Supreme Court has held that § 1920 defines the term 'costs' as used in Rule 54(d), and has rejected the view that the discretion granted by Rule 54(d) is a separate source of power to tax as costs expenses not enumerated in § 1920. *See Taniguchi v. Kan Pacific Saipan, Ltd.,* 132 S.Ct. 1997, 2001 (2012) (internal citation and citation omitted). And thus, taxable costs are limited to relatively minor, incidental expenses as is evident from § 1920, which lists such items as clerk fees, court reporter fees, expenses for printing and witnesses, expenses for exemplification and copies, docket fees, and compensation of court-appointed experts. *Id.* Indeed, the assessment of costs most often is merely a clerical matter that can be done by the court clerk and taxable costs are a fraction of the

nontaxable expenses borne by litigants for attorneys, experts, consultants, and investigators. *Id*. (citation omitted).

Here, the parties agreed during the course of the evidentiary hearing on damages that the costs taxable in this case are limited by 28 U.S.C. § 1920. Specifically, § 1920 includes (1) fees of the clerk and marshal; (2) fees for transcripts; (3) fees and disbursements for printing and witnesses; (4) fees for copies of papers necessarily used in the case; (5) docketing fees; and (6) compensation of court appointed experts and interpreters. 28 U.S.C. § 1920. Given the agreement of counsel, the Court omits from the three separate billing sheets [DE 120-2; DE 120-3; and DE 134-1], those items not listed in § 1920 and therefore the Court permits the recovery of costs for copying, printing, and witness subpoenas. The Court will also award the $350 filing fee, which during the evidentiary hearing Mr. Campiti agreed was a legitimate reimbursement. No expert witness costs will be recovered, since an expert witness was admittedly unnecessary to the presentation of plaintiffs' case or to calculate their damages. Plaintiffs did not seek an award of their other costs on any other basis, ultimately acknowledging they aren't recoverable, and therefore the Court declines to award them. Accordingly, the following chart reveals the total amount of costs deducted and ultimately deemed recoverable under § 1920:

**COSTS CALCULATION**

**TIME SHEET DE 120-2:**

|  |  |
|---|---|
| Total Cost Submitted | $ 2,126.16 |
| Costs Struck | $ (1,240.16) |
| Total Cost Allowed | $ 886.00 |

**TIME SHEET DE 120-3:**

|  |  |
|---|---|
| Total Cost Submitted | $ 1,524.31 |
| Costs Struck | $ (1,346.81) |
| Total Cost Allowed | $ 177.50 |

**TIME SHEET DE 134-1:**

|                      |              |
|----------------------|-------------:|
| Total Cost Submitted | $   211.86   |
| Costs Struck         | $  (194.61)  |
| Total Cost Allowed   | $     17.25  |

**GRAND TOTAL COSTS DUE FOR ALL TIME SHEETS:**

|                            |               |
|----------------------------|--------------:|
| **TIME SHEET DE 120-2:**   | $   886.00    |
| **TIME SHEET DE 120-3:**   | $   177.50    |
| **TIME SHEET DE 134-1:**   | $     17.25   |
|                            | **$ 1,080.75**|
| **FILING FEE:**            | **$   350.00**|
|                            | **$ 1,430.75**|

V.      Injunctive Relief

Plaintiffs request an injunction barring Kladis from sexually harassing future employees, and subjecting them to an unfair, hostile, and biased work environment [DE 117; DE 137]. While plaintiffs no longer work for Kladis, the plaintiffs contend that there is nothing stopping him from continuing these actions against current or future employees of the restaurant, and in fact plaintiffs' counsel has been contacted by another individual who apparently filed a charge of discrimination with the EEOC.

While the Court does not question its authority to provide injunctive relief under 42 U.S.C. § 2000e-5 for intentional unlawful employment practices, *see E.E.O.C. v. Ilona of Hungary, Inc.* 108 F.3d 1569, 1578 (7th Cir. 1997), the plaintiffs have not shown that an injunction is appropriate here.  Here, plaintiffs no longer work for defendant and thus are not likely to be the victim of any further discrimination.  Moreover, the plaintiffs have not sufficiently established that the discriminatory conduct could possibly persist in the future. *Id*. Rather, the plaintiffs merely speculate that Kladis will continue to engage in discriminatory practices, and have provided insufficient details concerning an unknown individual alleged to have filed a charge of discrimination with the EEOC.  The Court also believes that the award of

damages and fees in this case serves as a sufficient deterrent to prevent these particular

defendants from engaging in any further intentionally discriminatory employment practices.

VI.    <u>Conclusion</u>

The Court enters final judgment on the jury's verdict [DE 108] and finds that Defendants

Nick Kladis and Nick's American Pancake & Café, Inc. (a/k/a American Pancake House), are

jointly and severally liable for payment of:

$500 plus post judgment interest accruing at a rate of 0.11% to Angela Heyne and $500 plus post judgment interest accruing at a rate of 0.11% to Angela King for their respective successful battery claims, while the remaining $3,000 plus post judgment interest accruing at a rate of 0.11% on the battery claims shall be paid to the victims compensation fund. With respect to this award, the defendants shall make payment of $4,000 plus post judgment interest to the clerk of the court, Ind. Code 34-51-3-6(b), and the clerk of the court is DIRECTED to pay Angela Heyne and Angela King each 25% of their individual punitive damage award of $2,000 plus post judgment interest, and deposit the remaining 75% of each the awards into the violent crime victims compensation fund established by Ind. Code 5-2-6.1-40, pursuant to Ind. Code 34-51-3-6(c);

$10,000 plus post judgment interest accruing at a rate of 0.11% in punitive damages to Angela Heyne for her success on her Title VII sexual harassment claim;

$10,000 plus post judgment interest accruing at a rate of 0.11% in punitive damages to Angela King for her success on her Title VII retaliation claim;

an award to Angela Heyne for back pay in the amount of $15,820.00, plus prejudgment interest at the rate of 3.25 %, compounded annually since February 2010, and post judgment interest accruing at a rate of 0.11%;

an award to Angela King for back pay in the amount of $728.00 plus prejudgment interest at the rate of 3.25 %, compounded annually since February 2010, and post judgment interest accruing at a rate of 0.11%.

Defendants Nick Kladis and Nick's American Pancake & Café, Inc. (a/k/a American

Pancake House), are also jointly and severally liable for the payment of attorneys' fees in the

amount of $103,605.70 and taxable costs in the amount of $1,430.75 to the law firm of Roberts

& Bishop.

For the reasons stated herein, the plaintiffs' motions for a permanent injunction are DENIED [DE 116; DE 137; DE 138], the plaintiffs' motion for attorneys' fees, costs and expert fees is GRANTED IN PART AND DENIED IN PART [DE 119], the defendants' motions to strike are DENIED [DE 122; DE 123; DE 139].

SO ORDERED.

ENTERED:  November 15, 2013

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court